**In re CHICAGO RYS. CO. et al.**

**WORCESTER et al. v. CHICAGO TRANSIT AUTHORITY et al.**

Nos. 9057, 9136, 9189, 9059, 9137, 9190, 9122, 9191–9193.

Circuit Court of Appeals, Seventh Circuit.
Jan. 4, 1947.

As Corrected Jan. 21, 1947.

---

60

Clyde E. Shorey, Robert W. Schupp, John E. Gavin, William R. Morgan, James A. Sprowl, Conrad Poppenhusen and Edward H. Hatton, all of Chicago, Ill., for appellants.

Thomas B. Hart, G. Gale Roberson, Edward P. McGuire, Tappan Gregory, Robert L. Hunter, Meyer Abrams, Werner W. Schroeder, Carl R. Latham, J. A. Miller, Charles Aaron, Wm. J. Friedman, Maurice Rosenfield, Henry F. Tenney, Roger Sherman, S. Ashley Guthrie, Geo. B. Rogers and Guy M. Peters, all of Chicago, Ill., Roger S. Foster, Sol. and Aaron Levy and Lawrence M. Greene, all of Philadelphia, Pa., (Shulman, Shulman & Abrams, of Chicago, Ill., of counsel) for appellees.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

These are appeals from two orders, the first of which approved for submission to certain security holders a proposal for the sale of certain assets of five Chicago street railway companies in a proceeding for reorganization under Chapter X of the Bankruptcy Act. 11 U.S.C.A. § 501 et seq. The companies are managed and operated as a unified system and are generally referred to as the Chicago Surface Lines. The companies involved are: (1) Chicago Railways Company, (2) Chicago City Railway Company, (3) Calumet & South Chicago Railway Company (these three companies are debtors under Chapter X proceedings of the Bankruptcy Act), (4) The Southern Street Railway Company (which is in equity receivership), and (5) Chicago & Western Railway Company (a Chicago City Railway Company subsidiary; it is not in bankruptcy or equity receivership). Chicago Railways is known as the north side lines; City Railway, Calumet, and Southern are designated as the south side lines. The second order, entered after such submission, found that the plan had been duly approved by all requisite majorities, and confirmed the plan.

The outstanding securities of the Surface Lines Companies are as follows:

CHICAGO RAILWAYS COMPANY:

(a) First Mortgage (5%) Twenty-Year Gold Bonds, due February 1, 1927 (outstanding after 25% payment on principal).... $41,741,250.00
(b) Five Per Cent Consolidated Mortgage Twenty-Year Gold Bonds, Series A, due February 1, 1927 ........................... 15,696,600.00
(c) Five Per Cent Consolidated Mortgage Twenty-Year Gold Bonds, Series B, due February 1, 1927 ........................... $16,934,405.00
(d) Purchase Money Mortgage (5%) Gold Bonds, due February 1, 1927 ........................... 3,969,155.00
(e) Adjustment Income Bonds (4%), due February 1, 1927............ 2,379,136.66
(f) Capital Stock ..................... 1,000 shares

CHICAGO CITY RAILWAY COMPANY:

(g) Five Per Cent First Mortgage Gold Bonds, due February 1, 1927 (outstanding after 15% payment on principal) ............. 27,644,550.00
(h) Capital Stock ..................... 180,000 shares

CALUMET AND SOUTH CHICAGO RAILWAY COMPANY:

(i) Five Per Cent First Mortgage Gold Bonds, due February 1, 1927 (outstanding after 35% payment on principal) ............. 3,332,550.00
(j) Capital Stock ..................... 100,000 shares

THE SOUTHERN STREET RAILWAY COMPANY:

(k) Capital Stock ..................... 24,000 shares

CHICAGO AND WESTERN RAILWAY COMPANY:

(l) Capital Stock ..................... 720 shares

Interest to August 1, 1945, has been paid on the three First Mortgage Bond issues. No interest has been paid since February 1, 1927, on any of the other issues. Thus it appears that the bonded indebtedness aggregates $111,697,646 for unpaid principal in default since February 1, 1927. The interest due thereon to February 1, 1946, amounts to $38,396,251.

Ninety-five per cent of the stock of the City Railway and all of the stock of the Calumet, the Southern, and Chicago & Western Railway are held under a trust known as The Chicago City and Connecting Railways Collateral Trust (hereinafter called "Collateral Trust"). The trust has issued collateral bonds, secured by the stock referred to, and preferred and common participation certificates. The remaining five per cent of the stock of the City Railway not held in trust is publicly owned.

In 1907 the City of Chicago adopted two ordinances, one granting a franchise to Chicago Railways Company to operate a system of street railways on the north side of Chicago, and the second, granting a franchise to Chicago City Railway Company to operate a system of street railways on the south side of Chicago, and in 1908 and 1909 franchises were granted to the three other companies, the stated terms of

all of the ordinances to expire on February 1, 1927. Thereafter the City granted various "day-to-day" extensions of these ordinances until July 15, 1938. Since that time no extension ordinances have been granted. By the ordinances the City reserved the right to purchase and take over the entire street railway system. In 1913 an ordinance was passed by the City providing for the unified operation of all the companies. This ordinance is known as the "Unification Ordinance," and since 1914 the companies have been operated as a unit.

On December 15, 1926, a creditor's bill was filed against Chicago Railways and receivers were appointed. Thereafter the trustees of various mortgages filed foreclosure bills or counter-claims and orders were entered consolidating the causes and extending the receivership to the foreclosure case. In 1930 another creditor's bill was filed against the City Railway and the Calumet. Receivers were appointed and the trustees under the first mortgages of these two companies filed foreclosure proceedings./ An intervening petition was filed by the trustee of the "Collateral Trust" for foreclosure of the pledge securing its bonds, and the receivership of the two south side companies was extended to include Southern Railway. Thus the properties of all the companies and the "Collateral Trust" were brought into the custody of the District Court. In 1928 and 1930 decrees were entered in these cases fixing the amount and priority of the liens of the various secured debts. The decree of 1928 adjudged that the Purchase Money mortgage was a lien superior to the Adjustment mortgage, and to that portion of the lien of the Consolidated mortgage which was secured by the property purchased from Andrew Cooke by Chicago Railways. In 1931 decrees of foreclosure sale were entered, the execution of which was postponed pending agreement on a plan of reorganization.

In 1929 the General Assembly of Illinois enacted legislation permitting the granting of a terminable permit by a city (Ill. Laws 1929, p. 271). Acting under this Act, the City Council of the City of Chicago, on May 19, 1930, passed an ordinance granting a terminable permit to Chicago Local Transportation Company. The validity of this legislation and of the ordinance was sustained in People v. City of Chicago, 349 Ill. 304, 182 N.E. 419. While the validity of the legislation was being tested, several plans for the purpose of reorganization, based on the 1930 ordinance, were formulated. These failed of consummation.

In 1933 the District Court recognized the impossibility of consummating a reorganization under the 1930 plan and appointed special counsel to assist all interested parties in amending the plan so as to make possible the acceptance of the 1930 ordinance. After extensive conferences, amendments to the 1930 plan were agreed upon by the security holders and were submitted by them to the court in March, 1934. On March 21, 1934, the Mayor of Chicago advised the City Council that an analysis of the ordinance of 1930 had convinced him that the 1930 plan did not meet the needs of the City and recommended that the time for acceptance of the 1930 ordinance, which had been extended to expire on April 3, 1934, should not be further extended. The Mayor's recommendation was followed by the City Council and the 1930 ordinance lapsed.

For the purpose of this opinion it will not be necessary to set forth the other steps that were taken with the end in view of arriving at a settlement of the rights of the various parties in these causes. Suffice it to say that after six different plans had failed, the district judge, on September 18, 1944, filed an opinion in which he reviewed the previous failures. He decided that a new procedure was necessary, and entered orders approving as properly filed and filed in good faith, certain bankruptcy petitions under Chapter X of the Bankruptcy Act, and appointed trustees for the companies, who, on November 28, 1944, filed a plan of reorganization. The trustees' plan proposed a reorganization and consolidation of the Surface Lines and the Chicago Rapid Transit Company, a company operating the elevated lines in the City, under the 1941 ordinance passed by the City Council of the City of Chicago. The court referred this plan to the Illi-

---

nois Commerce Commission and to the Securities and Exchange Commission (hereinafter called SEC). The Illinois Commerce Commission filed a report disapproving the plan.

After the institution of the Chapter X proceedings, the City filed five claims against the estates of the debtor companies. One for $10,012,642 as compensation for the use of City streets since July 15, 1938, another for $508,070 for cleaning streets within the rights of way, the third for $61,271 for restoration of street pavements within the rights of way, the fourth for $8,033 for damages to City property, and the fifth for $1,078 for unpaid permit and inspection fees. The trustees filed objections denying any liability to the first, third, fourth and fifth claims. With respect to the second claim, the trustees stated that the amount was due, but asserted a counter-claim for $252,378. In addition, the trustees of Chicago Railways & City Railway set up a counter-claim for damages resulting from the City's construction of subways.

On January 19, 1945, the district judge stated that he had called upon the Governor of Illinois and the Mayor of Chicago to do all they could to agree on a solution of the traction problem. February 23, 1945, counsel for the City advised the court that the Governor and the Mayor had proposed a joint plan for the creation of a Metropolitan Transit Authority. This was the first time in 20 years of traction history that the City and State authorities were united on a plan of action for the solution of the traction problem.

On February 28, 1945, the City filed its proposal and plan for the reorganization of the Surface Lines. The plan proposed that all transportation properties (including renewal funds and other operating funds) of the Surface Lines be sold at a fair upset price of $75,000,000; stated that the City desired to purchase at that price; provided for the disposition of claims between the City and the trustees; suggested the retention by the trustees for the benefit of the security holders of certain cash funds and all earnings to April 30, 1945, and the delivery to the City of the moneys which had been accumulated since 1938 in the City Compensation Fund. A distribution to security holders was suggested. The distribution covered not only the amount to be paid by the City as purchase price but also the other assets which the estates would retain and have available for distribution. The suggested distribution did not follow the rule of strict priority. Some funds were allocated to junior interests, such as the Series B bondholders, without provision for the payment of the senior issues in full. A companion plan filed by the City also contemplated acquisition of the Rapid Transit properties and the unification thereof with those of the Surface Lines.

On April 12, 1945, the Governor of Illinois approved an Act of the General Assembly known as the "Metropolitan Transit Authority Act" (Ill.Rev.Stat.1945, c. 111⅔, § 301 et seq.). Chicago Transit Authority, created by that Act, is a municipal corporation with power to acquire, own and operate for public service a transportation system in the metropolitan area of Cook County, Illinois. Broad powers for the acquisition of local transportation systems "By purchase, condemnation, lease, gift or otherwise," Ill.Rev.Stat.1945, c. 111⅔, § 307, and for the issuance of revenue bonds are given by the Act. The Authority and all of its operations were expressly excluded from the jurisdiction of the Illinois Commerce Commission. April 23, 1945, the City Council of the City of Chicago passed an ordinance authorizing exclusive local transit operation by the Chicago Transit Authority, effective after its approval by referendum. That ordinance and the Metropolitan Transit Authority Act were submitted to a vote of the people of Chicago. Both were approved and adopted, and appointments of members of the Chicago Transit Board, the governing body, were made by the Governor and the Mayor. Validity of both the Act and the ordinance was upheld. People v. Chicago Transit Authority, 392 Ill. 77, 64 N.E.2d 4.

On April 23, 1945, the court referred the City's plan to the Illinois Commerce Commission. That Commission, on June

6, 1945, filed a report in which it stated that there is public interest in the plan and if the City designates the Transit Authority as its permittee under the City's plan, the Commission was precluded from exercising its opinion as to the public interest in the proposed acquisition of the Surface Lines properties by the Transit Authority.

On August 13, 1945, the SEC filed its advisory report. It stated that the proposed upset price of $75,000,000 would be fair if the plan were amended (a) to provide a waiver by the City of its claim to the fund known as the City Compensation Fund and certain other claims of the City, and (b) to provide for the retention by the trustees of net earnings up to the date of actual transfer of the properties. August 17, 1945, Chicago Transit Authority was substituted in place of the City under the proposed plan, and on October 8, 1945, it filed amendments to the plan as suggested by the SEC, and waivers of the City's claims, as suggested by the SEC, were made by ordinances adopted by the City Council.

Appellants filed objections to the plan, upon which hearings were held and evidence was heard. During these hearings some of the parties agreed to an amendment which proposed a compromise with the minority stockholders of the City Railway under which they would receive a small payment out of the retained assets, without, however, cutting down the amount distributable to the bondholders of City Railway. This amendment together with the entire plan, was resubmitted to the SEC. It disapproved the amendment, but in all respects concluded that the plan as amended and adopted by the Transit Authority was fair.

The court found as a fact that $75,000,-000 was a fair, equitable and reasonable upset price for the plan properties and filed an opinion in which he summarized the proceedings and the action which had been taken therein prior to placing the properties under Chapter X of the Bankruptcy Act; referred to the creation and development of the Transit Authority; reviewed the testimony; concluded that the

amount to be realized for the properties would need to be $37,000,000 more than that provided under the plan before the Series B bondholders would be entitled to participate at all; pointed out that the price fixed by the Authority is not an arbitrary figure, but was arrived at as a result of negotiations between the City and the court-appointed committee; disapproved the suggested compromise with the minority stock interest of the City Railway, pointing out that that company is not currently earning interest, and that a valuation arrived at by capitalization of earnings requires a judgment as to probable future earnings. The court stated that while the Series B bondholders have objected, they have presented no alternative other than a separate reorganization of Surface Lines, which the court had declared impracticable and which the City's unification policy made impossible, and entered the order approving the plan as amended.

Having found that an upset price of $75,000,000 was fair and that the plan was equitable and feasible, the court allocated this amount among the Surface Lines as follows:

| | | % |
|---|---|---|
| Chicago Railways | $44,475,000.00 | 59.30 |
| Chicago City Railway | 24,966,397.50 | 33.29 |
| Calumet & South Chicago Ry. Co. | 4,717,500.00 | 6.29 |
| Southern Street Ry. Co. and Chicago and Western Ry. Co. | 841,102.50 | 1.12 |
| Total | $75,000,000.00 | 100% |

These percentages represented in general the respective participation of the companies in the Surface Lines earnings after payment of City compensation and joint account expenses. To these amounts the court added the respective contribution of each company to the $6,000,000 City Compensation Fund plus the general net cash funds of each company after deducting interest on all of the first mortgage bonds to December 31, 1945.

Under the plan, substantially all of the properties of these companies, including all cash and securities in certain specified funds, would be sold at an upset price of $75,000,000, payable in cash; it includes a proposal that the Chicago Transit Authority will bid at the sale the amount of the

upset price. If the plan is carried into effect, it is estimated that there will be available for distribution and expenses, after allowance of interest on the first mortgage bonds to December 31, 1945, approximately $93,400,000. This consists of the $75,000,000 purchase price, about $12,400,000 in general net cash assets, and $6,000,000 in the City Compensation Fund. After deducting a reserve for expenses and other claims and contingencies, the initial distribution is estimated to amount to $88,400,000. This estimated sum is to be distributed among the various classes of security holders as follows:

| Chicago Railways Co.: | | |
|---|---|---|
| First Mtg. 20-yr. Bonds | $41,741,250 | |
| *Westinghouse Electric Co. | 51,355 | |
| Consol. Mtg. 20-yr. Bonds: | | |
| Series A | 10,918,597 | |
| Series B | None | |
| Purchase Money Mtg. Bonds.. | 1,525,666 | |
| Adjustment Income Bonds.... | None | |
| Capital Stock | None | |
| Total | | $54,236,868 |
| Chicago City Ry. Co.: | | |
| First Mtg. Bonds | $25,286,204 | |
| *General Electric Co. | 4,018 | |
| Capital Stock | None | |
| Total | | 25,290,222 |
| Calumet & So. Chicago Ry. Co.: | | |
| First Mtg. Bonds | $ 3,332,550 | |
| *General Electric Co. | 4,384 | |
| Capital Stock | 3,842,119 | |
| Total | | 7,179,053 |
| Southern St. Ry. Co. and Chicago & Western Co.: | | |
| Capital Stock | $ 1,394,707 | |
| Total | | 1,394,707 |
| Grand Total | | $88,100,850 |

*By court decree these claims have same priority as first mortgage bonds.

All of the first mortgage bonds, except those of City Railway, are being paid in full. The Series A and Purchase Money bonds of Chicago Railways will be paid in part on their principal and nothing will be paid on interest arrearages. Series B and Adjustment Income bonds and the capital stock of Chicago Railways and the capital stock of City Railway are excluded from participation.

The five appellants are a committee representing the owners of five per cent of the publicly held stock of City Railway and holders of Series B bonds of Chicago Railways. The appellees are Chicago Transit Authority, the SEC, and the holders of, and committees representing, first mortgage bondholders of the three debtor companies.

While many points are raised by appellants, the primary question is whether the District Court properly approved and confirmed the plan as fair and equitable and otherwise in compliance with Chapter X of the Bankruptcy Act. In this situation it may be well that we consider first some of the points raised, which, if meritorious, would make it unnecessary for us to discuss the principal question here involved. Before doing so, we note that various other incidental questions believed and claimed to have a bearing upon the chief issue, have been raised in the briefs—such as, that the plan had not been submitted to the Illinois Commerce Commission; that the Transit Authority was limited to acquisition by condemnation; that the conduct of the City and Transit Authority has been inequitable; and that the court erred in failing to find that amendment No. 1 was fair and equitable and that the allocation between the Purchase Money bonds and Series B bonds was unfair. These we have considered, but since they do not change our conclusion, they need not be discussed.

Appellants argue that the plan is not authorized under Chapter X of the Bankruptcy Act; that parties to such a proceeding are the debtor, its creditors, and its stockholders; that a plan of reorganization must be presented by a trustee and that neither the City nor the Transit Authority is a creditor or stockholder of debtor, hence neither is a party entitled to file a plan.

To be sure, ordinarily a plan provides a continuity of interest in the enterprise for those participating by an exchange of new securities for old, but such a plan is not the only type of plan authorized by the provisions of Chapter X, since § 216 of Chapter X, 11 U.S.C.A. § 616, expressly provides that a plan of reorganization may include "The sale of all or any part of its [debtor's] property, either sub-

ject to or free from any lien, at not less than a fair upset price and the distribution of all or any assets, or the proceeds derived from the sale thereof, among those having an interest therein * * *." For example, see In re Lorraine Castle Apartments Bldg. Corp., 7 Cir., 149 F.2d 55; Country Life Apartments v. Buckley, 2 Cir., 145 F.2d 935; Patent Cereals v. Flynn, 2 Cir., 149 F.2d 711, and while it is true that it is the primary responsibility of the trustee to file a plan of reorganization, here the trustees did file a plan and before its approval, the creditors of the debtor companies, in the form of a substitute plan, filed the present plan. Moreover, no objection was made by appellants to the filing of the plan by the City and the plan was adopted by other creditors who recommended its approval.

Appellants assert that the plan deprives them of contractual rights contained in the 1907 ordinance and that the court was without jurisdiction to order the release of, or reduction of, the rights of the Series B bonds.

■ They argue that the City of Chicago induced investments of capital in the companies, now represented by the outstanding securities. They insist that the ordinance embodies covenants whereby the City reserved the right to purchase the properties and that the City agreed that if the City or its licensee did not purchase the properties on or before February 1, 1927, and if the City should thereafter grant a new ordinance to a licensee, then such licensee should be obligated to pay for the properties, a price computed under the terms of the 1907 ordinance; that the City has granted Transit Authority a new ordinance and is a licensee of the City and is obligated to pay the purchase price provided for by the ordinance. In other words, that the ordinance constituted a binding contract on the part of the City or its licensee to buy the properties at the price of $172,000,000, and Harris Trust & Savings Bank v. Chicago Rys. Co., D.C., 39 F.2d 958, and Superior Water, Light & Power Co. v. City of Superior, 263 U.S. 125, 44 S.Ct. 82, 68 L.Ed. 204, among other cases are cited. The Harris Trust case did not involve the question of whether the City had entered into a contract to buy. In that case the plaintiff sought a decree to direct the receivers to cease paying compensation to the City, and that money in certain funds be paid on the first mortgage bonds. In the Superior Water case, the City agreed to purchase. It had entered into a valid contract to buy the water plant. In our case § 20 of the ordinance merely provided that the City reserved to itself the right to purchase, while §§ 21 and 22 made it clear that the City had the right or option, not the obligation, to buy, hence the cases cited are inapplicable. True, § 23 does provide that if, after the expiration of the ordinance, the City should grant a franchise to a new company, the new company shall buy the property upon the terms upon which the City might have purchased. Even so, that fact, under the circumstances in this case, is no reason why the plan should not be approved, since all contingent rights of a debtor pass to its trustee and become part of its estate, Pollack v. Meyer Bros. Drug Co., 8 Cir., 233 F. 861, and may be dealt with in Chapter X proceedings.

Appellants owning the publicly held stock of City Railway stress the point that the true value of City Railway has not been determined and that City Railway was not proven to be insolvent. They insist that the company's stock has always had a substantial market value, that the company has a long record of earnings, that interest on its debts has been fully paid, and argue that the court failed to find specific values for the properties, failed to determine the earning capacity of any of the debtor companies or of the properties, and failed to determine the earning capacity of the enterprise as a whole. Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510 at page 520, 61 S.Ct. 675 at page 682, 85 L.Ed. 982, in which the court said: "Absent the requisite valuation data, the court was in no position to exercise the 'informed, independent judgment' * * * which appraisal of the fairness of a plan of reorganization entails." and Kelley v. Everglades Drainage District, 319 U.S. 415, 63

S.Ct. 1141, 87 L.Ed. 1485, in which the court held that there must be findings sufficient to indicate the factual basis for the ultimate conclusion, are cited in support of the argument.

■ The manner of reaching the valuation, so long as it complies with the statutory standards, is not important. Ecker v. Western Pacific R. R., 318 U.S. 448, 483, 63 S.Ct. 692, 87 L.Ed. 892. In the Kelley case, different classes of creditors asserted prior claims to separate sources of revenue. The court, however, made no determination of the extent to which each class was entitled to share in a particular source or of the fairness of the allotment of each class in the light of the probable revenues to be anticipated from each source. In discussing the question there involved, the court at page 419 of 319 U.S. at page 1143, of 63 S.Ct. said: "The nature and degree of exactness of the findings required depends on the circumstances of the particular case," and suggested it is sufficient if the court sets forth its conclusions as to prospective earning power with findings supporting its apportionment of future earnings among creditors and stockholders so as to preserve their relative priorities, together with reasons for its conclusions and essential supporting data, and continuing said: "Once the priority of liens has been determined, considered estimates of future earning power afford a substantial basis for appraising the interests of the respective lienors."

In our case the court found that the Surface Lines companies were unified in operation and that the separate ownership of property and identity of each of the companies has been preserved and maintained, and specifically enumerated the securities which were liens upon the properties of the respective companies which had to be satisfied before the stockholders might participate. As to the division of the upset price, the court found and considered the relative earning capacity of City Railway as against that of the other companies and all other relevant factors, and allocated the upset price for the plan properties, as between all of the companies, in the proportions heretofore noted, and found that such allocation was fair and equitable and that the percentages also heretofore noted, represent the respective participation of the companies in the Surface Lines earnings. Thus the court found the true value of City Railway.

■■ Whether a debtor is insolvent and its common stock is to be treated as worthless depends, of course, upon whether the amount of its liabilities exceeds the fair market value of its assets. Meyer v. Dolan, 2 Cir., 145 F.2d 880. The court found that City Railway's debts were $2,678,150 more than its assets. We think this was evidence of insolvency, and the findings, as to value, under the rules suggested by the court in Kelley v. Everglades Drainage District, supra, and Group of Investors v. Chicago, M., St. P. & P. R., 318 U.S. 523, 529, 63 S.Ct. 727, 87 L.Ed. 959, were adequate.

The claim is made that the cause must be reversed because (1) the plan made no provision for the stockholders of City Railway and the other appellants to accept or reject the plan, and (2) that the plan should have made some provision for them in the event that the properties should realize more than sufficient to pay the bondholders in full.

■ As to (1), it will be enough to say that since the court found the City Railway's assets on distribution were over $2,000,000 less than its total outstanding bonds and that the assets of Chicago Railways would not pay the Series A and the Purchase Money bonds in full, the appellants had no equity; there was no value to be protected, and they were not entitled to vote. In re 620 Church Street Building Corp., 299 U.S. 24, 57 S.Ct. 88, 81 L.Ed. 16, and Reconstruction Finance Corp. v. Denver & R. G. W. R. R., 66 S.Ct. 1282. As to (2), the order classifies security holders in the order of their priority and states that at final distribution any excess cash shall be allocated to security holders in accordance with their respective priorities.

We now consider appellants' major contention that the plan is unfair and contrary to the applicable law, in that the

properties were insufficiently valued, and that the finding of value of $75,000,000 is without support in the record.

█ Appellants concede that where the court applies the legally appropriate concepts, definitions and criteria of value, the fixing of a valuation figure is a question of fact and is not reviewable upon appeal except on the ground that it is not supported by competent evidence. This being so, our problem is (a) whether the court applied the correct juridical concepts of value relevant in reorganization cases, and (b) whether there is evidentiary support to sustain the findings.

In this connection appellants argue that the court's finding of value was determined on doubts and misgivings that a "not overoptimistic buyer" might entertain as to the legal status of the companies on the streets of Chicago, based upon fears that the Transit Authority or the City might install a competitive service, and that the court rejected probable future earnings.

█ The reorganization of a transportation system is of public interest and capitalization is an essential factor in its efficient operation. Ecker v. Western Pacific R. R., supra, 318 U.S. 474, 63 S.Ct. 692, 87 L.Ed. 892. It is a basic requirement in its determination not only to respect the priorities of the various classes of claimants, but also to give the reorganized company a reasonable prospect for survival, Group of Investors v. Chicago, M., St. P. & P. R., supra, 318 U.S. 540, 63 S. Ct. 727, 87 L.Ed. 959, if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, Consolidated Rock Products Co. v. Du Bois, supra, 312 U.S. 526, 61 S.Ct. 675, 85 L.Ed. 982, and requires an appraisal of many factors which cannot be reduced to a fixed formula. It entails a prediction of future events. Group of Investors v. Chicago, M., St. P. & P. R., supra, 318 U.S. 542, 63 S. Ct. 727, 87 L.Ed. 959. This requires consideration of past earnings, factors affecting earnings, probable future earnings, and the appropriate rate of capitalization.

█ With these observations in mind, we pass to (b), the question of evidentiary support to sustain the findings. Appellants point to the fact that in 1941 when the court had before it a proposed plan of unification of the companies with those of the Rapid Transit system, the court found the value of all of the assets of the Surface Lines at $136,329,674. In addition, they say that they offered evidence embracing factors on which to base valuations. This evidence, they claim, tended to prove that the earnings of the Surface Lines over the years demonstrate stability as to the probable earnings of the system, and that the fair value of the properties is $138,000,000. This evidence the court considered, but was not convinced that the properties had a value greater than $75,000,000.

██ It would unduly lengthen this opinion to relate in detail the evidence of appellees. We need only to say that it showed the condition of the industry as a whole (the court in Market Street R. v. Railroad Commission of California, 324 U.S. 548, 554, 65 S.Ct. 770, 774, 89 L.Ed. 1171, said it was "a generally sick industry."); the past earnings of the Surface Lines, declining over a period of 20 years; estimates of future earnings, together with a series of elements likely to increase costs and to decrease revenue. It revealed that the present plight of Surface Lines was largely the result of increased expenses, bus competition, and the use of the private automobile, and the court had before it exhibits and testimony which translated this declining trend into capitalized value by capitalizing the average net earnings for 15-year, 10-year, and 5-year periods before and including 1944. The net of the five years through 1944 capitalized at 5.5% brought a value of $77,428,000 and if capitalized at 7%, a value of $60,836,000. It is clear that the court considered every proper factor suggested by the parties, and having in mind that an estimate, as distinguished from mathematical certitude, was all that could be made, Group of Investors v. Chicago, M. St. P. & P. R., supra, 318 U.S. 542, 63 SCt. 727, 87 L.Ed. 959, it bottomed its finding of value upon all the evidence before the court. In addition it had the benefit of expert and disinterested advice, rendered in conformity

with a report of the SEC under § 172 of Chapter X, 11 U.S.C.A. § 572. True, the report was not evidence. It was but advisory, intended to aid the court in the solution of the many complicated financial and business problems involved.

Under these circumstances we think the court applied the correct juridical concepts of value relevant in reorganization cases, and since the court's finding of value was made on disputed evidence, we cannot say that the finding of a value of $75,000,000 was without support in the record; consequently, the orders must be affirmed. It is so ordered.