Luis **GONZALEZ HERNANDEZ** et al.,
Appellants,

v.

**Orlando de ARAGON, Trustee, Appellee**
(two cases).

In the Matter of **CENTRAL SAN VI-
CENTE, INC., Debtor.**

**Nos. 6479, 6514.**

United States Court of Appeals
First Circuit.

Heard Feb. 7, 1966.

Decided April 20, 1966.

**931**

Carmen B. Hernandez, San Juan, P. R., for appellants.

Orlando J. Antonsanti, San Juan, P. R., for appellee.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

These appeals, challenge various orders of the district court finding feasible, approving, and confirming a Chapter X plan of corporate reorganization of a Puerto Rico sugar refinery company, Central San Vicente, Inc., pursuant to 11 U.S.C. § 501 et seq. Appellants include several unsecured creditors and one stockholder.

Our standard of review in such cases is clear. As this court has said of another corporate reorganization, "If the words 'fair and equitable, and feasible' * * * are to be taken in their broad general meaning, and if the confirmed plan of reorganization is not in conflict with some hard and fast rule of law, it is clear to us that the order of the district court should be affirmed. The determination of the district court as to the fairness of the plan will not be set aside unless clearly shown to be erroneous * * *." Horowitz et al. v. Kaplan et al., 1 Cir., 1951, 193 F.2d 64, 71, cert. denied, 1952, 342 U.S. 946, 72 S.Ct. 561, 96 L.Ed. 704.

The record in this case fails to disclose any such clear error. Rather, it demonstrates a prolonged and painstaking effort by the court, the trustee, and others over a period of four years to restore the debtor to a viable economic life. Further, this effort was made in an industrial sector—the sugar industry—which in Puerto Rico has been beset by both general uncertainty and substantial fluctuations in prices and prospects. Undoing the work that has gone forward under such circumstances is not lightly to be contemplated.

The course of the effort was as follows. In August 1962, after the discovery of serious shortages of sugar in debtor's warehouses, the debtor was placed in receivership by the Superior Court of Puerto Rico. Creditors filed a Chapter X petition in the federal district court in September 1962. On November 6, 1962, after hearing, the district court found the debtor insolvent and subsequently appointed appellee, Orlando de Aragon, as trustee.[1] Subsequently both an appraisal and an audit were directed to be made. The appraisal, made by a competent mechanical engineer, set a "final estimate of value" of $5,500,000 for the debtor's assets, as of July 1963. The auditor, an independent accounting firm, criticizing the appraisal as not giving enough weight to earnings potential or liquidation value, preferred to use 1963 cost figures of $3,987,734 as a closer approximation to value.

The trustee, in April 1964, filed vigorous "observations" dissenting from the appraiser's evaluation, alleging that it considerably overstated the market value, in the light of the decline of the sugar industry in Puerto Rico, the distress

---

1. It appears that appellee, acknowledged to be an outstanding sugar mill operator, was an employee of Central Mercedita, Inc., and was loaned by it for his period of service as trustee. Central Mercedita, Inc. was not a creditor and did not participate in these proceedings, although in October 1962, it had made a written offer to the Government Development Bank for Puerto Rico, the major secured creditor, proposing a management contract and participation in a plan of reorganization. The district judge very properly showed his awareness of a possible conflict of interest should Central Mercedita, Inc. become a participant in financing the reorganization. But no such situation developed. In the meantime the court was well advised to accept the services of an able manager while being fully aware of and equipped to deal with a conflicts of interest problem should one arise.

sales of several other local sugar mills, the disappearance of farms and acreage from sugar cane production in the area where the debtor was located, the decreasing yield in sugar from sugar cane, and the past unsatisfactory earning history of the debtor.[2]

During 1963 the business of the debtor was carried on by appellee and adequate provision was made for the filing and proving of claims. In late November 1963, the debtor filed a plan of organization, which was duly objected to by appellee as violating provisions of the Bankruptcy Act under the circumstances. In January 1964, appellee filed a plan, incorporating proposals of several creditors. This plan, objected to by the debtor, became moot when a purchaser which had contracted to buy the debtor's 1964 sugar production encountered financial difficulties. Thereupon, in September 1964, the two major secured creditors, the Government Development Bank for Puerto Rico and Chase Manhattan Bank (whose total secured debts were in excess of $3,300,000) filed the plan now in issue.[3]

The principle features of this plan, insofar as this case is concerned, are the following. The Government Development Bank would contribute $400,000 for working capital, half of which would be covered by a new fifteen year first mortgage replacing its existing mortgage, and would receive 51 per cent of the stock in a reorganized company. Chase Manhattan would take a new second mortgage to secure the principal indebtedness owed it of $729,000, would forego accumulated interest to the date of the new mortgage (then stated to be $108,-826), and would receive 20 per cent of the stock in the reorganized company. The remaining 29 per cent of the stock would be distributed to unsecured creditors, who would also name two members of a board of seven directors.

Hearings were held on this third plan and amendments, and, on October 6, 1964, the district court issued an order finding it feasible and submitting it to the Securities and Exchange Commission. On November 6, 1964 the court issued an order approving the plan and directing that a copy of the plan as amended be sent to each creditor. The secured creditors, 99 per cent of the independent farmer creditors, and 70 per cent of the unsecured creditors approved the plan. After hearing and consideration of arguments against confirmation, the court, on January 29, 1965, confirm-

2. That the trustee's "observations" were neither capricious nor arbitrary seems clear to us from a reading of the appraisal report. The appraiser, using various methods, arrived at these extraordinarily similar results: reproduction cost less depreciation, $5,598,480; "economic value" (capitalization of income), $5,400,-000; "going concern value" (identical to "economic value" since there was no "good will value" reflecting earnings about normal), $5,400,000; value by comparison, $5,346,270; final estimate of value, $5,500,000. While the appraiser's final objective was to ascertain fair market value or "the measure of coveting or desire that humans, under free and fair conditions, might have for the properties involved", his basic assumptions, looking ahead twenty and thirty years, were that "with increasing world populations sugar lands will be hard put to supply world demand" and that the cost of living would increase. This is fair market value very much in *futuro*. While he mentioned that the recent sales of sugar mills in Puerto Rico were distress sales, he did so only for the purpose of explaining that they could not be used for comparison. Constant yields and tonnage were projected as were income figures. At an estimated $8 per cwt sugar price, total income was projected at $7,109,940, net income before depreciation at $351,200, and net income at $101,200. Had the appraiser used the $6.20 figure embodied in the final plan, his pro-forma profit and loss statement would have reflected a loss before depreciation of $1,108,960.

3. It is significant, in assessing the district court's ultimate action on the plan, to note that the sugar prices used in constructing the various plans fluctuated as follows:

Debtor's plan   Nov. 1963   $7.50 per cwt
Trustee's plan   Jan. 1964   8.50 per cwt
  (except a small quantity under existing contract at $10.055 per cwt)
Final plan      Sept. 1964   6.20 per cwt

ed the plan, finding it fair, equitable, and feasible, and also found:

"That, after taking into consideration the appraisal made by the independent appraiser, the observations of the Trustees [sic] in connection with said appraisal, the audit made by the independent auditing firm, and the evidence introduced as to the prospective earnings of the debtor as a going concern, the fair value of the debtor's business is three million two hundred thousand dollars ($3,200,000). * * "

The most basic attack on the plan concerns the value placed on the assets by the district court. If there had been clear error in substantially undervaluing the enterprise, common creditors and perhaps stockholders could claim to have been unfairly treated.

■ Appellants make several arguments relating to evaluation. They say that the court did not determine the value of the debtor's properties and debts as of the date of filing of the Chapter X petition. As to this, we think that the court acted properly. There was every reason for the expeditious transfer of debtor's operations from the receivership to a federal trustee. There was adequate basis for the court's finding of insolvency and inability to pay debts as they matured. Indeed, we find no averment of error as to the correctness of this finding. It would have served no purpose to delay this finding until an audit and appraisal were available.

■ Appellants argue further that, while the court admittedly made a specific finding as to value at the time the plan was *confirmed*, error was committed in not making such a finding at the time of *approval*. They also charge error in the court's action in accepting the guidance of the trustee and the accounting firm as to value over that of the appraiser. We think the court, having adjudicated insolvency, was not acting improperly under the facts of the case to delay fixing a figure for the value of the properties. Even within the eleven months separating the submission of the first plan from that of the third, the price of sugar had fluctuated substantially (see note 3, supra), and one major purchaser had been subjected to a Chapter XI proceeding. There was a precise finding before confirmation of the plan, when the most current data could be taken into account. We cannot say that the district court erred in postponing its formal finding under the circumstances of this case.

■ The rejection of the appraiser's report was not arbitrary or unreasoned. (See note 2, supra.) A company *in extremis*, in an unpredictable industry, in an area where that industry has seen dramatic decline, with no evidence of buyer interest, ought not to be subjected to standards prevailing in more thriving industrial sectors. As the Supreme Court said, in Consolidated Rock Products Co. et al. v. Du Bois, 1941, 312 U.S. 510, 526, 61 S.Ct. 675, 685, 85 L.Ed. 982:

" * * * The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable. * * * Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance. A sum of values based on physical factors and assigned to separate units of the property without regard to the earning capacity of the whole enterprise is plainly inadequate."

It was this basic approach which the court properly followed in this case.

■ This being so, we cannot say that the plan unfairly discriminated in favor of the secured creditors and against common creditors and stockholders. With total assets of August 31, 1964 being $5,529,867 and total debt being $8,407,612 (to which should be added subsequent borrowing on trustee's certificates in the amount of $534,400 as of December 1, 1964), it is obvious that stockholders had no equity. Worcester et al. v. Chicago Transit Authority, et al., 7 Cir., 1947, 160 F.2d 59, cert. denied, 331 U.S. 808, 67 S.Ct. 1192, 91 L.Ed.2d 1829; Meyer et al. v. Dolan et al., 2 Cir., 1945, 145 F.2d 880, cert. denied, 324 U.S. 867, 65 S.Ct. 916, 89 L.Ed. 1422.

Nor can we say, with secured debt (including interest and borrowing on trustee's certificates) approaching $4,000,-000, that the plan gave unfair emphasis to it. Indeed, this emphasis would seem to have been required by the full and absolute priority rule of Northern Pacific Ry. Co. v. Boyd, 1913, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 and Case v. Los Angeles Lumber Products Co., 1939, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110. The substitution of first and second mortgages and extension of time, the provision of $400,000 in working capital by the Government Development Bank and the giving up of accumulated interest by Chase Manhattan, together with provision for payment of small creditors, independent farmers and employees, and a 29 per cent participation of common creditors in stock holdings and a like representation on the Board of Directors seem to us to reflect a reasonable effort to give the debtor hope for survival, reflecting the legitimate interests of the two banks whose forbearance make survival possible, and at the same time providing for some participation by others.

The amendments proposed by appellants would have altered the plan only by giving common creditors noninterest bearing third mortgage bonds payable in twelve annual installments for one half of their claims and the remaining half in five per cent non-cumulative and non-voting preferred stock. They also proposed giving shareholders new (and admittedly worthless) common stock in exchange for old, all to be in a voting trust "in favor of" the Government Development Bank.

Part of these proposals—those concerning the preferred stock being layered over new common—would convey so little in substance that the court's refusal to accept them could not be said to have prejudiced appellants. As for the rest of the proposal, we could not find the court below in error in refusing to add the burden of annual debt repayments to the already fragile financial structure of the reorganized enterprise. Indeed, to have adopted this proposal might well have violated the teaching of Case v. Los Angeles Lumber Products Co., supra.

We do not deem the remaining issues worthy of extended discussion. To the allegation that one of the appellants was deprived of his day in court because of the time taken by a special master to examine his claim, we observe that the special master did recommend allowance of the claim in September 1964. It appears to us that there was adequate reason for the court to have ordered the examination and we cannot say that the special master, in taking six months to allow a claim in excess of half a million dollars, was unduly dilatory. In any event, the appellant was under no disability to participate in all of the hearings and arguments which followed the filing, in September 1964, of the third plan. In fact he did join in proposing the amendments which we have discussed above. We see no evidence that appellant was wrongfully denied any substantive opportunity to influence further the course of this proceeding.

■ Appellants make the additional argument that a genuine two thirds approval from common creditors was not forthcoming because a pre-petition claim of Olavarria & Co., Inc. in the amount of $1,293,685.99 ought to have been reduced by setting off a post-petition debt owed the estate by another company, Galban Lobo Puerto Rico, Inc. The reason

urged is the fact that the same top officers served both companies. Wholly apart from the difference in corporate entities, this is not a setoff having the kind of mutuality required by 11 U.S.C. § 108. In the Matters of North Atlantic and Gulf Steamship Co., S.D.N.Y.,1962, 204 F.Supp. 899; In re Techcraft, Inc., S.D.N.Y.,1959, 177 F.Supp. 790.

Finally, while allegations of mismanagement are said to have resulted in an excessive increase in the debtor's debt, appellants have left it, without specification, that the record is "full of instances" of exorbitant expenditures and compensation. We have found nothing that could remotely suggest a reason for reversal.

Affirmed.