**In the Matter of SPECTRUM ARENA, INC., Debtor.**

**Appeal of Philip KALODNER et al.**

**Nos. 71–1970, 71–1971, 71–2166 and 71–2170.**

United States Court of Appeals, Third Circuit.

Argued March 13, 1972.

Decided May 26, 1972.

Philip P. Kalodner, Philadelphia, Pa., for appellants.

Sidney Chait, Adelman & Lavine, Philadelphia, Pa., for appellees, Trustees of the Spectrum Arena, Inc.

LeRoy E. Perper, White & Williams, Philadelphia, Pa., for appellee, ARA Services, Inc.

Gilbert W. Oswald, Philadelphia, Pa., for appellees, Foreman and Snider, as proponents of the Trustees' Plan of Reorganization.

Before MAX ROSENN and JAMES ROSEN, Circuit Judges and TEITELBAUM, District Judge.

## OPINION OF THE COURT

PER CURIAM:

The financial problems of the debtor, Spectrum Arena, Inc., led it to bankruptcy shortly after its incorporation. Spectrum was organized[1] in May, 1967 to construct and operate an indoor arena to be used for Philadelphia's professional hockey and basketball games, as well as for other sporting and special events ranging from boxing and tennis matches to ice shows and circuses. Even the wide diversity of events scheduled there, however, could not make the operation solvent. In May, 1968, the principal mortgagee, Fidelity Bank, took possession of the arena and the other secured creditors filed a Chapter X reorganization proceeding. 11 U.S.C. § 501 et seq.

The reorganization court gave detailed consideration to the proposed plans and to the modifications and amendments subsequently submitted. It also inquired into various creditors' claims in order to determine their validity. The facts relating to this complicated reorganization are fully set forth in the comprehensive opinions of the district court, 340 F.Supp. at 755, 767, 784, 786, 794, 806.

In December, 1971, at the conclusion of these extensive hearings, the reorganization court, 340 F.Supp. 794, confirmed a plan submitted by the Trustees.[2] 11 U.S.C. § 621. This plan, which provided for payments in full of secured and unsecured creditors, called for two major changes in the capital structure of the debtor. First, the First Pennsylvania Bank was to extend a $6.5 million mortgage loan and a $500,000 line of credit to the reorganized corporation, making it possible for it to satisfy the first, second, and part of the third mortgage. Second, the fourth mortgagee, Foreman, was to subordinate his claim to all other indebtedness and receive in return all of the stock of the reorganized company.[3]

The consolidated appeals before us now are brought by Philip Kalodner,[3a] who

---

1. The Spectrum was financed by four mortgages on a 50 year lease given by the City of Philadelphia to Jerry Wolman, who, in turn, assigned the lease to Spectrum Arena, Inc. Fidelity Bank, the holder of the first and second mortgages, extended $5.5 million for the construction of the Spectrum Stadium. The third mortgagee, ARA, extended $2 million. A fourth mortgage, in the amount of $1.6 million, was given to McCloskey and Co., which had built the Stadium. This mortgage was subsequently assigned to Foreman. (See footnote 6)

2. This plan had been conceived by Foreman and his brother-in-law, Snider. Foreman was interested in the future of Spectrum because he hoped to protect the fourth mortgage which he had acquired from McCloskey & Co. Snider, who had been one of the original shareholders of Spectrum, maintained an active interest in the corporation because his hockey team, the Philadelphia Hockey Club, played its matches in the Arena.

3. The plan also provided (1) that the unsecured $500,000 line of credit be covered by personal guarantees given by the Foremans and the Sniders, and (2) that ARA, upon satisfaction of its original mortgage, extend $1.4 million in the form of a new loan.

3a. Kalodner takes these appeals on behalf of Joseph King, the Debtor Spectrum Arena, Inc., and himself.

holds 92% of the stock of the original Spectrum Corporation.[4] The appellant raises numerous challenges to the ruling of the reorganization court, but his primary attack is on the method of financing relied upon in the plan for reorganization. He contends that instead of adopting the Trustees' plan based on a new mortgage loan, the court should have adopted his plan, which was to be financed by the issuance of $9.5 million of tax free industrial bonds, pursuant to 26 U.S.C. § 103. Under this plan, the original stockholders would have retained a stock interest in the reorganized corporation and Kalodner, instead of being in his present position of owning no stock in the reorganized debtor, would have owned a little less than half of the stock.[5]

■ Whether or not the confirmed plan satisfied Section 621(2), (3), (4), (5) were questions of fact for the reorganization court. That court determined that the statutory standards had been met and we will not reopen the case to hear evidence *de novo*. As the Supreme Court has said, "[i]n a complex case of this nature it is not the province of this Court to attempt to retry issues of fact which have been fully litigated below." Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson, Trustee in Bankruptcy, 390 U.S. 414, 444, 88 S.Ct. 1157, 1173, 20 L.Ed.2d 1 (1968). Our function is merely to determine whether there was "substantial evidence" supporting the district court's decision to reject Kalodner's plan and adopt the Trustees' plan. See In Matter of Riddlesburg Mining Co. Debtor, 224 F.2d 834, 836 (3d Cir. 1955) and In re Mifflinburg Body Works, 205 F.2d 150 (3d Cir. 1953). Stating the principle in slightly different terms, the question before us is whether the trial court's findings of fact "were clearly erroneous." F.R.Civ.P., Rule 52 (a).

■ We hold that there is substantial evidence here to support the judge's determination. As stated by Judge Higginbotham in his well-reasoned opinion of December 28, 1971, the Kalodner plan was replete with contingencies. The crux of Kalodner's plan, the issuance of industrial development bonds, was also its major weakness. These securities could not be issued without the approval of both the City Council of Philadelphia and the Internal Revenue Service of the United States Government. Neither had given approval as of December 28, 1971, and, as the judge noted, the appellant was not "one scintilla closer" to obtaining approval than he had been the "second" it was submitted to the court in June, 1971. Furthermore, even had the issue been approved by both parties, the bonds would still have had to be marketed to the public. Bache and Co., Inc. did issue an "opinion letter" indicating that it was interested in underwriting the issue, but the letter stressed that their interest was conditioned on a continuation of the current market situation and "should not be construed as a firm commitment."

Finally, had the court waited to see whether Kalodner's plan could be approved and effectuated it would have been jeopardizing the viability of the Trustees' plan for reorganization. As Judge Higginbotham explained, First Pennsylvania's commitments for a $6.5 million first mortgage and a $500,000 line of credit were "terminable at will" and "[a]n indefinite postponement of weeks or months could increase the probability of the First Pennsylvania Company terminating that offer." ARA had prom-

---

4. Kalodner paid no cash consideration for the stock he received, but undertook to pay Wolman, the organizer of the Spectrum from whom he received the stock, the first $220,000 he might receive from the stock either by dividends or sale. Prior to the transfer of the Spectrum stock, it had been stipulated in Wolman's personal bankruptcy proceedings (Chapter XI) that Spectrum was insolvent and its stock worthless.

5. Under the Kalodner plan, one-half of the stock of the reorganized debtor would be given to the City of Philadelphia and the other half would be divided among the shareholders of the original corporation.

ised to provide $1.4 million, but if a plan were not consummated by the end of 1971, ARA had the right to reduce its proposed loan by $500,000. In addition to these possible losses of $7.5 million, delay would have led to a loss of $500,000 as a matter of certainty. Fidelity, the original first and second mortgagee, was willing to waive more than $500,000 in arrears Spectrum owed it, if Spectrum paid by December 31, 1971; payment after the end of 1971 meant an additional $500,000 burden for the reorganized company. The district judge allowed the appellant ample time to try to secure the necessary two-fold approval of the plan he had submitted to the court in June, 1971. Particularly in view of the attendant risks of delay enumerated above, the judge's decision not to postpone the adoption of a plan beyond the end of 1971 was an exercise of sound judgment and not an abuse of discretion.

■ ■ The appellant has set forth other objections to the plan, but we summarily dismiss them. There was substantial evidence to uphold the trial court's determinations (1) that Foreman's fourth mortgage was valid,[6] (2) that the debtor was insolvent,[7] and (3) that the terms of the ARA-Spectrum concession agreement permitted ARA to recover its costs in construction, furnishing and equipping the Blue Line Club as a "cost of operating." [8] Protective Committee for Independent Stockholders of TMT Trailer Ferry, *supra*. The appellant's claim that the court should have considered the merits of the debtor's plan as set forth in his fourth and fifth amendments is also without merit: the amendments were untimely. The peti-

6. The fourth mortgage originally belonged to McCloskey, who acquired it because Jerry Wolman, the owner of 88% of the Spectrum stock, had appropriated approximately $1.6 million from Spectrum and thereby impaired its ability to satisfy its obligations to McCloskey. To replenish the money appropriated, Wolman had the Philadelphia Eagles Football, Inc. (1) transfer $445,000 of its funds to Spectrum and (2) guarantee the McCloskey debt to the amount of $1,235,000. These transactions might have counterbalanced Wolman's prior misappropriation had he been sole owner of the Eagles, but Wolman owned only 52% and Foreman controlled the remaining 48%. Furthermore, Foreman never consented to the transfers and, as soon as he discovered Wolman's actions, he made a formal written objection to them.

Wolman's misappropriation of Eagles' funds were remedied, however, when the Eagles were sold. Wolman's 52% of the net proceeds of that sale went to pay Wolman's personal debts, but the share was inadequate to compensate McCloskey fully; so, in line with a compromise agreement, $2,350,000 of Foreman's interest in the proceeds were used to satisfy Wolman's Spectrum and other personal debts. In return, Foreman acquired the McCloskey claim and the accompanying fourth mortgage which, accounting for payments received and interest due, amounted to approximately $1,530,000 as of December 31, 1971.

7. Kalodner frankly acknowledges that he presented no expert testimony on the valuation of Spectrum. (Appellant's Brief, p. 31) The only information before the court was the testimony of Mr. Lukens, which the court adopted. Mr. Lukens was "a most distinguished appraiser * * * from a most reputable realty company * * * [who served as an] independent expert. Mr. Lukens was most impressive as a witness. Despite vigorous cross-examination he remained calm, deliberate, knowledgeable and seemingly totally impartial." Opinion of the court, December 23, 1971.

F.R.Civ.P., Rule 52(a) provides that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." If we give due regard to the judge's assessment of Mr. Lukens' credibility and to the fact that he was the only expert testifying as to valuation, we are led to the inevitable conclusion that the judge's adaptation of Mr. Lukens' evaluation was not "clearly erroneous." In re Muskegon v. Motor Specialties, 366 F. 2d 522, 526 (6th Cir. 1966).

8. ARA acquired the exclusive franchise for the food and beverage concessions for Spectrum's private Blue Line Club and the rest of the Stadium at the time it became the third mortgagee. For a thorough analysis of the "cost of operating" issue, see Judge Higginbotham's opinion Re: Petition for Accounting of ARA Services, Inc., December 23, 1971.

tion submitted by Kalodner did not qualify as an 11 U.S.C. § 622 modification. Rather, the petition represented an attempt to "substitute a new plan" which the judge was entitled to reject. Country Life Apartments v. Buckley, 145 F.2d 935, 937 (2d Cir. 1944), Cf. Prudence-Bonds Corp. v. City Bank Farmers Trust Co., 186 F.2d 525, 528 (2d Cir. 1951). Finally, in view of our disposition of Kalodner's proposed alternative plan, the contention that ARA would have been obligated to subordinate its claim to the Section 103 industrial bonds Kalodner hoped to have Bache underwrite is moot.

The district court's orders will be affirmed.[9]

Achee **BAILEY** et al., Plaintiffs-Appellants,

v.

**AMERICAN TOBACCO COMPANY** et al., Defendants-Appellees.

No. 71–1902.

United States Court of Appeals, Sixth Circuit.

June 16, 1972.

---

9. We note that the plan has been successfully consummated.

"Pursuant to the direction of the Court below, consummation of the Trustees' Plan was effected on December 31, 1971, at the offices of the Commonwealth Land Title Insurance Company. The first and second mortgages of The Fidelity Bank, on which there was owed principal and interest and costs, as of December 31, 1971, in the aggregate amount of of $7,253,095.94, were satisfied in full. The amount required to pay Fidelity was raised by a new first mortgage to First Pennsylvania Banking and Trust Company in the principal sum of $6,500,000 and Trustees' funds in the amount of $753,- 095.94. ARA delivered a satisfaction of its third mortgage on which there was due a balance of principal and interest of $1,415,049.51, receiving $15,049.51 in cash from the Trustees and a second mortgage created by the reorganized company in the amount of $1,400,000. The Trustees deposited the sum of $168,000 in escrow with the title company to pay and satisfy all mechanics' liens. Checks aggregating $114,000 were mailed to unsecured creditors in payment of the initial 50% under the Trustees' Plan. Payment of $50,000 was made to Leonard Tose, assignee of the claim of the Philadelphia Eagles Football Club, pursuant to the provisions of the Plan.

William L. Robinson, New York City, for plaintiffs-appellants; Neville Tucker, Louisville, Ky., on brief.

Kennedy Helm, Jr., Ralph H. Logan, Herbert L. Segal, Louisville, Ky., for defendants-appellees; Stites & McElwain, Louisville, Ky., on brief for American Tobacco Co.; John Frith Stewart, Irwin H. Cutler, Jr., Segal, Isenberg, Sales & Stewart, Louisville, Ky., on brief for Tobacco Workers Intl. Union Local No. 247; Hardy, Logan & Hastings, Louisville, Ky., on brief for General Drivers, Warehousemen and Helpers, Local Union No. 89.

Before PHILLIPS, Chief Judge, EDWARDS, Circuit Judge, and McALLISTER, Senior Circuit Judge.

In the aggregate, the Trustees disbursed to creditors, secured and unsecured, out of Trustees' funds, a total sum amounting to $1,100,505.45. All of the issued and outstanding stock certificates of the Debtor corporation were delivered to the Trustees and turned over by them to the reorganized company for cancellation.

Control of operations and management were turned over by the Trustees to the reorganized company, which has been in charge and control of operations since 7:00 P.M. on December 31, 1971, when closing was completed." (Appellee's Brief, pp. 28–29).

