651 F.2d 1326
 6 Bankr.Ct.Dec. 544, 6 Fed. R. Evid. Serv. 254
 In the Matter of KING RESOURCES COMPANY, and International
Resources, Limited,
a subsidiary to original debtor, Debtors. KING RESOURCES
STOCKHOLDERS' PROTECTIVE COMMITTEE and Aminex
Resource Corporation,
John M. King, IV, Carylyn Ann King, Mark M. King and Sally A. King,
Central National Bank of Cleveland,
Floyd E. Dickerson, Trustee in Bankruptcy for John McCandish King,
Consolidated Oil & Gas, Inc.,
Harvey L. Davis, Appellants,
v.
Charles A. BAER, Trustee, King Resources Company, Debtor,
and International Resources Limited, a subsidiary
to original debtor, Appellees.
 Nos. 77-2002 to 77-2007.
 United States Court of Appeals,
Tenth Circuit.
 Argued July 17, 1979.
Decided June 9, 1980.
 
 Phillip C. Gans, Denver, Colo. (Cogswell, Chilson, Dominick & Whitelaw, Denver, Colo., were on brief), for appellants John M. King, IV, Carylyn Ann King, Mark M. King and Sally A. King, et al.
 John F. Head of Head, Moye, Carver & Ray, Denver, Colo., for appellant Floyd E. Dickerson.
 A. Jack Kane, Atty., Denver, Colo., for appellant Harvey L. Davis.
 Russell P. Rowe and Perry L. Goorman of DeMuth, Eiberger, Kemp & Backus, Denver, Colo., for appellant Central National Bank of Cleveland, N.A.
 Fred E. Neef and Robert Swanson of Neef, Swanson & Myer, Denver, Colo., for appellant Consolidated Oil & Gas, Inc.
 Edward A. Walters, of Bradley, Campbell & Carney, Golden, Colo., for appellants King Resources Stockholders' Protective Committee and Aminex Resource Corp.
 John S. Pfeiffer, Denver, Colo. (Robert J. Kapelke, and Stephen Klein, Denver, Colo., were also on brief), for appellees Charles A. Baer, Trustee of King Resources Company and International Resources Limited.
 Daniel S. Greenfeld, New York City (Michael L. Hirschfeld and Jean Sharpe-Altman of Marshall, Bratter, Greene, Allison & Tucker, New York City; and Harry M. Sterling and Nancy D. Miller of Sterling, Simon & Rubner, Denver, Colo., were also on brief), for appellees Texas International Co.
 Roger Goldburg and Barry Gassman, of Shank, Irwin & Holmes, Denver, Colo., for appellees First Jersey National Bank, European-American Bank & Trust Company and The Federal Deposit Insurance Corp.
 Thomas J. Kerwin, Denver, Colo., and John E. Hoffman, Jr., Stephen F. Ellman of Shearman & Sterling, New York City, for appellee Citibank, N.A., as Indenture Trustee.
 Robert L. Shanstrom and Thomas S. Nichols of Davis, Graham & Stubbs, Denver, Colo., for appellee United Bank of Denver, N.A., as Indenture Trustee.
 Before HOLLOWAY, McWILLIAMS and McKAY, Circuit Judges.
 HOLLOWAY, Circuit Judge.
 
 
 1
 These appeals are from an order of the district court confirming a plan of reorganization of King Resources Company under Chapter X of the now-superseded Bankruptcy Act, 11 U.S.C. § 501 et seq. (1976). Numerous issues are raised concerning the central questions of mootness, the finding of insolvency, and the finding that the plan is fair and equitable, and feasible, inter alia. We will now outline only a brief historical view of the case and will treat the factual details as we concentrate on the questions presented.
 
 
 2
 We are addressing the issue whether the plan was fair and equitable, and feasible in detail in our separate opinion today in Nos. 77-1969 and 1971, Citibank N.A. v. Baer, 651 F.2d 1341. Our opinion in Citibank expresses fully our reasons for upholding the finding of the fairness of the plan, which is outlined there, and we will in this opinion treat separate challenges to the plan made in these appeals. In like manner, our Citibank opinion also upholds the finding of insolvency and discusses some separate contentions made in Citibank on that issue.
 
 
 3
 Reorganization proceedings began on August 14, 1971, when an involuntary petition for reorganization of the debtor, King Resources Company (KRC), was filed.[1] The proceedings finally resulted in an amended plan of reorganization which was approved by the creditors and subsequently confirmed by the district court on October 7, 1977. (I App. 109-11). The reorganization plan provides for a debt-free reorganized company, Phoenix Resources Company. Under the plan, secured creditors of KRC would receive cash for their claims to the extent of their collateral and general unsecured creditors with claims of $200 or less would also be paid in cash. Two classes of stock in the new company would be issued to the remaining creditors.
 
 
 4
 The stock is divided into Class A stock with a $20 liquidation preference issued to senior debt holders and Class B stock (virtually identical to Class A stock except for the liquidation preference) issued to debenture holders. Other creditors receive equal amounts of Class A and B stock. Old shareholders of KRC receive nothing under the reorganization plan due to the determination that KRC was insolvent. The only shareholders of KRC receiving new stock under the reorganization plan include those members of a class who sued KRC on the basis of fraud and settled for a general unsecured claim in the amount of $12 million. Members of this class, known as the Dietrich class, would receive stock in the reorganized company proportionate to their individual claims. (I App. 61-82).
 
 
 5
 The appellants here include (1) King Resources Stockholders' Protective Committee and Aminex Resource Corporation (the Committee); (2) John M. King, IV, Carlynn Ann King, Mark M. King and Sally A. King (the King children); (3) Central National Bank of Cleveland (Central National); (4) Floyd E. Dickerson, Trustee in Bankruptcy for John McCandish King (Dickerson), (5) Consolidated Oil & Gas, Inc. (Consolidated); and (6) Harvey L. Davis (Davis). The appellees include (1) Charles A. Baer, Trustee, King Resources Company, Debtor, and International Resources Limited, a subsidiary to original debtor (Trustee); (2) Texas International Company (Texas International); (3) First Jersey National Bank, European American Bank & Trust Company and The Federal Deposit Insurance Corporation, as liquidators of the Franklin National Bank (First Jersey); and (4) Citibank, N.A., and United Bank of Denver, N.A., as Indenture Trustees (Indenture Trustees).
 
 
 6
 The appellees all challenge the appellants' assertions and Texas International and First Jersey additionally argue that the appeals should be dismissed as moot due to substantial consummation of the reorganization plan. We turn to the mootness question first.
 
 I. MOTION TO DISMISS
 
 7
 We deal first with the motion to dismiss by Texas International since a determination that dismissal is appropriate would necessarily dispose of the other issues raised.[2] Texas International and First Jersey argue that this appeal should be dismissed for three reasons. First, it is argued that the reorganization plan has been substantially consummated within the meaning of 11 U.S.C. § 629 which prohibits, after substantial consummation, any "proposed alteration or modification (which) materially and adversely affects the participation provided for any class of creditors or stockholders by the plan." The appellees argue that because the relief requested by various appellants would materially and adversely affect participation rights under the plan, such relief is precluded by § 629.
 
 
 8
 Second, it is argued that this court could not follow the recommendations of some appellants and reverse the confirmation order because a new plan of reorganization would necessarily involve cancellation of shares held by good faith purchasers who are not parties to this action. Hence, they could not be divested of their shares and as a result, no effective relief could be fashioned even if there were a reversal. Consequently the appeal is moot.[3] Finally, it is argued that this court is without jurisdiction to hear this appeal. The basis of this argument is that once the plan has been substantially consummated, no court has the power to decide whether or not to allow a modification in contravention of § 629. (Texas International Brief 48-67, First Jersey Brief 8-11).
 
 
 9
 We recognize that it is the duty of the courts to decide actual controversies by a judgment which can be carried into effect, and not to give advisory opinions on moot questions or abstract propositions. Mills v. Green, 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293. And we agree with Texas International that, inasmuch as the confirmation order was not stayed pending appeal, we could not compel third parties who have subsequently made good faith purchases of stock in the reorganized company to return their stock. See Bankruptcy Rule 10-801(2) ("Unless an order approving a sale of property or issuance of a certificate of indebtedness is stayed pending appeal, the sale to a good faith purchaser or the issuance of a certificate to a good faith holder shall not be affected by the reversal or modification of such order on appeal whether or not the purchaser or holder knows of the pendency of the appeal."); In re Rock Industries Machinery Corp., 572 F.2d 1195, 1199 (7th Cir.) (knowledge of the grounds for appeal likewise does not vitiate "good faith" status of purchaser.). Hence, if we assumed that the only effect of reversal on appeal would be to order the impossible, we would not address the merits of the appeal. See, e. g., Matter of Combined Metals Reduction Co., 557 F.2d 179, 186-91 (9th Cir.) (dismissing appeals involving consummated sales of property on the basis of mootness.)
 
 
 10
 However, just as in Combined Metals Reduction Co., supra, this appeal involves more than just consummated sales. As the court there stated, id. at 194-95:
 
 
 11
 One of the orders therein appealed is the order confirming the plan of reorganization. Although the appellant did not obtain a stay of that order, this issue differs from the other appeals covered by the trustee's motion to dismiss. If we were to conclude that the appellant is correct, and that the plan was erroneously confirmed by the district judge, then a decision to that effect could have some effect on the proceedings below. While much of the debtor's property has been liquidated, and many of the creditors have been paid, the plan still controls the actions of the trustee. . . . As a result, we are of the opinion that the order of confirmation is not moot, and we will consider the merits of this issue below.
 
 
 12
 Thus we cannot say that a decision that the plan was erroneously confirmed could not have some effect on the proceedings below, even if it could not undo all that has taken place.[4] For this reason, we are not convinced that we are dealing with moot appeals. Nor are we persuaded on our record that appellees' claims of substantial consummation are clearly established. Before refusing to consider these appeals on the merits because of consummation which has occurred, some hearing and development of a record would be required, with more delay.
 
 
 13
 Thus we are not convinced that we should refuse to hear the merits because of the steps in consummation of the plan which have occurred. In any event, because of the disposition we feel proper, no injustice results from our considering the merits of the appellants' cases. Consequently we turn to the merits of these appeals.
 
 II. INSOLVENCY
 
 14
 a. The appellate contentions on the finding of insolvency
 
 
 15
 The appellants argue that the court erred in determining that KRC was insolvent for several reasons. In support of all their arguments, appellants rely heavily on Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982, and Protective Committee v. Anderson, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1, saying that the court failed to follow the guidelines of these cases in arriving at its valuation.
 
 
 16
 More specifically, the Committee first argues that the court failed to make findings as to the amount of mortgaged assets, the amount of mortgage debt, the extent of the deficiency of the assets and the amount of the unmortgaged assets and their value. It argues that such findings were necessary in order to determine an allocation of new securities in case any equity remained. Further, the court failed to make a finding as to the specific amount of KRC's indebtedness, saying only that, including claims and post petition interest, KRC was insolvent by $40 million. (Brief of the Committee, 34-35).
 
 
 17
 Appellants next attack the valuation method used by the court in finding KRC to be insolvent. The Committee and Central National argue that because KRC held both producing and non-producing properties, the producing properties should be valued by capitalization of prospective earnings, and the non-producing properties should be valued at fair market value. The total of these figures would then equal the value of the company. (Brief of Committee, 36; Brief of Central National, 23-24). According to these appellants very little testimony concerned future earnings, focusing instead on cash flow and fair market values. (Brief of Committee, 37-38; Brief of Central National, 25). The only testimony regarding future earnings was unreliable in that it was based on outdated information and thus did not reflect material changes which had taken place since that time. (Brief of Committee, 39; Brief of Central National, 26-28).
 
 
 18
 Although the Committee and Central National agree that future income should be capitalized and take exception only to the way the income was determined, two other appellants, Dickerson and the King children, argue that the only fair way to value KRC is to capitalize projected cash flow, rather than net income. They argue that because of the "non-cash charge intensive character" of the oil and gas business, price/cash flow ratios are more appropriate than price/earnings ratios. They explain that non-cash charges include depreciation and depletion allowances which are book entries made to arrive at taxable income, although such charges do not always reflect economic reality. Hence, cash flow is a more accurate representation of the company's economic worth. These appellees argue that if the proper cash flow figures had been used, a finding of solvency would have resulted. They maintain that although the trustee's experts properly used cash flow figures, they improperly used past rather than future cash flow amounts. (Dickerson Brief, 13, 38; King Children Brief, 25-36).
 
 
 19
 All of the above appellants argue that the court did not use proper capitalization and discount rates, and that the use of proper rates would have resulted in a determination of solvency. The court's use of a 14.5% discount rate was higher than any rate used by the various experts who testified, including those testifying on behalf of the trustee. (Central National Brief, 29; Dickerson Brief, 35). And by incorporating a 5% risk and depletion factor into this figure, the court considered depletion more than once in its calculations. First it used net income which had already deducted a depletion expense. Second, it capitalized over a period of twenty years, rather than indefinitely due to the assumption that the assets of the company would be depleted in that time. Finally, by using it as part of its discount rate, the court was considering depletion for a third time. (King Children Brief, 31; see Committee Brief, 45).
 
 
 20
 Appellants additionally object to the use of Sun Oil Company and other undisclosed "comparable companies" used by the court in arriving at a value for KRC. The objections are based on the lack of reasons given by the judge for finding these companies to be comparable and the lack of any evidence in the record showing these companies to be comparable. (King Children Brief, 36-38; Committee Brief, 45-48; Central National Brief, 30-32; Dickerson Brief, 35-36). Appellants argue that in using these comparisons, the court took judicial notice of a "fact" contrary to F. R. Evidence 201. (Committee Brief, 46; Central National Brief, 31).
 
 
 21
 As another basis for attacking the court's valuation method, appellants argue that the court should have included the value of all non-producing properties in its valuation of KRC rather than just the value of KRC's interests in the Canadian Arctic Islands. Because of the high percentage of non-producing properties which KRC owns, capitalization of future earnings does not in itself give a true picture of the company's worth. By adding the fair market value of all non-producing assets to the capitalized future earnings value of KRC, a finding of solvency would have resulted. (King Children Brief, 38; Committee Brief, 52-53; Central National Brief, 32-34; Dickerson Brief, 36-37).
 
 
 22
 The appellants attack the valuation of all non-producing properties as too low, but focus their argument on the valuation of the Canadian Arctic Islands interests, arguing that the valuation should be $29.4 million rather than the $18.2 million accepted by the court. The valuation accepted by the court, called the Sproule estimate, was erroneous in that it did not separately value the most potentially productive area, the Sverdrup Basin, which is also the area in which KRC holds most of its interests. The success ratio in the Sverdrup Basin is higher than that of the area, as testified to by appellants' experts, and would have produced the higher valuation of $29.4 million. (King Children Brief, 40-42; Committee Brief, 52-53; Central National Brief, 34).
 
 
 23
 Finally, the appellants object to the court's reference to Texas International's purchase of various banks' claims against KRC at 102% of their value as a factor indicating that the banks felt that KRC was insolvent, since they otherwise would not have sold such claims without any consideration for the great amount of post-petition interest due. Appellants argue that the only bank officer who testified about the Texas International transaction gave various reasons for the sale, none of which indicated a belief that KRC was insolvent. (Committee Brief, 48; King Children Brief, 42-43).
 
 
 24
 The only other appellant attacking the court's method of valuation,[5] Harvey L. Davis (Davis), incorporates by reference other appellants' arguments and adds an additional contention that the court should have used the "more realistic" approach of valuing KRC's various assets separately and then adding the values together, rather than capitalizing prospective earnings. Davis reasons that if the sum of the assets exceeds the capitalized earnings approach, then it is a more accurate representation of the company's value. (Davis Brief, 2-10).
 
 
 25
 Appellees respond generally that the district court's valuation was not clearly erroneous and hence must be sustained. They argue that the court properly followed the principles of Protective Committee v. Anderson, supra, and Consolidated Rock Products Co. v. DuBois, supra, in determining the going concern value of KRC. (Indenture Trustees' Brief, 2-3; First Jersey Brief, 2-7). The court used an acceptable, even conservative, discount rate applied to proper future income projections and corroborated this result by comparing the discount rate to the price/earnings ratios of comparable companies. To have added the value of all non-producing properties to the above figures would have impermissibly inflated KRC's going-concern value, according to the appellees.
 
 
 26
 Further, appellees argue that the bulk of the non-producing assets consists of cash which represents an "accumulated deficiency in KRC's investment in and exploration of new productive properties." (Texas International Brief, 41). Accordingly, this cash is needed to make future investments in order to assure the company's continued earning capacity. And even though the court added the value of the Canadian Arctic interests because of its belief that KRC has more non-producing assets than most companies, certain appellees question whether any separate value should have been added for these interests, since the evidence on their value was so speculative. (Texas International Brief, 23-45).
 
 
 27
 The trustee argues not only that the court properly determined valuation in its own calculations, but also that the valuation established by Standard Research and the trustee was an acceptable approach even though it capitalized cash flow rather than net earnings. In valuing companies like KRC which hold depreciating assets, both commentators and the Securities Exchange Commission recognize discounting cash flow as a proper method of valuation. (Trustee's Brief, 21-24).
 
 
 28
 None of the appellees directly refute appellants' contention that the court took improper judicial notice of Sun Oil Company and other unnamed "comparable" companies, but simply point out that these calculations, as well as the Texas International transaction, were used merely to corroborate other calculations which the court had made. (Texas International Brief, 31-32; Trustee's Brief, 27).
 
 
 29
 b. Discussion of the insolvency finding
 
 
 30
 In examining this issue, we agree that a determination by the district court of valuation is a finding of fact which will not be reversed on appeal unless clearly erroneous. Moulded Products, Inc. v. Barry, 474 F.2d 220, 225 (8th Cir.), cert. denied, 412 U.S. 940, 93 S.Ct. 2779, 93 S.Ct. 2779; see F.R.Civ.P. 52(a). Moreover, an estimate and not "mathematical certitude" is all that can be achieved in determining future earning capacity. Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 526, 61 S.Ct. 675, 685, 85 L.Ed. 982. And we of course give great weight "to the long familiarity of the District Judge with the debtor and to his evaluation of the witnesses who testified in his presence." Protective Committee v. Anderson, supra, 390 U.S. at 444, 88 S.Ct. at 1173. Yet if our examination of the record reveals that the district court did not use the proper method of valuation, such valuation cannot stand even though it could not be described as clearly erroneous. Moulded Products, Inc. v. Barry, supra, at 225. This is because "(e)valuations of evidence reached by the accurate application of erroneous legal standards are erroneous evaluations." Protective Committee v. Anderson, supra, 390 U.S. at 445, 88 S.Ct. at 1173, 1174.
 
 
 31
 By now it is clear that it is proper to determine the going concern value of the company. As the Supreme Court stated in Consolidated Rock Products Co. v. DuBois, supra 312 U.S. at 526, 61 S.Ct. at 685 and reiterated in Protective Committee v. Anderson, supra, 390 U.S. at 442, 88 S.Ct. at 1172:
 
 
 32
 As Mr. Justice Holmes said in Galveston, Harrisburg & San Antonio Ry. Co. v. Texas, 210 U.S. 217, 226, (28 S.Ct. 638, 639, 52 L.Ed. 1031) 'the commercial value of property consists in the expectation of income from it'. . . . Such criterion is the appropriate one here, since we are dealing with the issue of solvency arising in connection with the reorganization plans involving productive properties. . . . The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable. . . . Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance.
 
 
 33
 Unlike the errors in the trial courts' approaches found in Consolidated Rock and Protective Committee v. Anderson, the court here considered future earnings as well as other facts relevant to future earning capacity. In its own calculations the court capitalized future earnings. On the basis of a capitalization of cash flow,[6] other valuations were made which were close to that of the district court. (II App. 518-20; 567-69; 573-77). We cannot say that the court's determination, based on the income figures, capitalization rates and discount rates used was clearly erroneous.[7] The court found that the value of KRC was between $90 and $100 million, see note 11, infra, and this finding has further support in the testimony of the trustee that the value of the company was between $95 million and $100 million. (II App. 518-20).
 
 
 34
 In refusing to add a separate value for KRC's non-producing assets other than the Canadian Arctic interests, the court reasoned:
 
 
 35
 I think it is fair to say that the present value rate takes care of the non-productive properties such as the Maine port, and things like that, where they aren't real substantial. Because I think they fairly compare to the percentage of non-productive properties owned by other companies, but I don't think it's fair to King to not give some credit to that which, admittedly, has great value in the Canadian Arctic and produces absolutely no income. (II App. 576).
 
 
 36
 We do not find this determination to be erroneous.[8]
 
 
 37
 Nor do we find error in the court's acceptance of the valuation of the Canadian Arctic interests as presented by the trustee's witness. The evidence relating to the valuation of these interests consisted of the evaluation prepared for the trustee, referred to as the Sproule report, which determined the value of these interests to be $18,230,600, and an evaluation prepared by Lewis Engineering Company for the Committee which valued these interests at approximately $30 million. (II App. 561-63). The trial court rejected the valuation of the Lewis report, saying that it made no sense and referring to the need to adjust it for an admitted $16 million dollar error and to the right of the trier of fact to disregard expert opinion.[9] We must give due regard to the opportunity of the trial court to judge the weight and credibility of the testimony of the witnesses, see F.R.Civ.P., 52(a), and doing so we cannot say that the court erred in accepting the Sproule report and rejecting the Lewis report. See In re Muskegon Motor Specialties, 366 F.2d 522, 530 (6th Cir.). Cf. Consolidated Oil & Gas, Inc. v. King Resources Co., No. 78-1780 (10th Cir., unpublished opinion filed Jan. 31, 1980) (affirming the district court's acceptance of similar evidence in determining the value of Consolidated Oil & Gas, Inc.'s interest in a contract between it and KRC pertaining to KRC's Canadian Arctic holdings).
 
 
 38
 As to the court's use of Sun Oil Company[10] and other unnamed companies as comparable to KRC for the purpose of determining valuation, we find no reversible error. We are mindful that F.R. Evid. 201 provides that a court may take judicial notice of an adjudicative fact if it is one "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The parties are "entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed." Such request may be made even after judicial notice has been taken if prior notification is not given.
 
 
 39
 We must agree that it seems doubtful that the comparability of Sun and the other companies was one "not subject to reasonable dispute" and therefore proper for judicial notice. See Protective Committee v. Anderson, supra, 390 U.S. at 440 n.19, 88 S.Ct. at 1171 ("Matters not in the record and not properly the subject of judicial review cannot form the basis of judicial confirmation of a plan of reorganization."). Yet even if such facts were not properly the subject of judicial notice and even if the parties properly objected to the court's sua sponte decision to take judicial notice of these facts,[11] we find no reversible error inasmuch as these figures were used merely as one approach to valuation, after the court made its own calculation.[12]
 
 
 40
 The same reasoning can be applied to the court's discussion of the Texas International transaction.[13] The court used this transaction only as an indication of the company's insolvency; the court's independent analysis of valuation of the properties, together with its acceptance of the Sproule report, serve as an ample foundation for the court's determination of value.
 
 
 41
 Moreover, contrary to appellants' assertions that Mr. Ricketts, the one bank official who testified, did not indicate a view that KRC was insolvent, his testimony does by reasonable implication support such a view. Under cross-examination by counsel for the King children the witness stated that among the factors that went into the bank's decision were that "there was a plan submitted, and the proceeding under reorganization in the bankruptcy hearing did not allow us to take into account post-petition interest." (II App. 394). He further stated that "the only way we could take into account post-petition interest is if King Resources was to be a solvent entity." (Id.) Even if the evidence was not sufficient for the trial judge to infer that the bankers believed KRC to be insolvent a point we do not accept that finding would be harmless error due to the other independent findings as to KRC's insolvency.
 
 
 42
 Finally, we turn to appellant Davis' contention that the court should have separately valued the various assets to arrive at the valuation. We feel the trial court did not err in rejecting such a theory and we note the district court's quotation from Consolidated Rock Products Co. v. DuBois, supra, 312 U.S. at 526, 61 S.Ct. at 685:
 
 
 43
 A sum of values based on physical factors and assigned to separate units of the property without regard to the earning capacity of the whole enterprise is plainly inadequate.
 
 
 44
 Any approach could be subjected to some criticism and any exact valuation made here $96,856,850 could be challenged, as the trial court noted. Nevertheless we are satisfied that the trial judge's findings on valuation and insolvency are amply supported by the record and find no legal error in the route he took to conclude that the company was insolvent.
 
 
 45
 III. THE FINDING THAT THE PLAN WAS FAIR AND EQUITABLE, AND FEASIBLE
 
 
 46
 In addition to contesting the finding of insolvency, appellants Central National, the Committee and Davis[14] challenge the court's finding that the reorganization plan was fair and equitable, and feasible. As noted earlier, in our Citibank opinion we are today sustaining this finding of the trial court and refer to our detailed analysis there on the fairness of the plan. We will here treat the particular contentions of Central National and the Committee.
 
 
 47
 The arguments of these appellants focus again on the court's determination that KRC was insolvent. Appellants maintain that KRC's financial position has improved substantially since the plan was first submitted and yet no modifications have been made in the plan to reflect the increased value; specifically, no modifications have been made which would allow KRC stockholders to participate in the reorganized company. Consequently, to have confirmed this plan was a gross abuse of the trial court's discretion. (Committee Brief, 54-55).
 
 
 48
 The Committee and Central National argue that the Committee's proposed plan should have been adopted by the court and that the court erred in finding that that plan was not fair and equitable, and feasible. The major difference between that plan and the one adopted is that the Committee's plan presumes solvency and therefore allows shareholder participation. Appellants also argue that the court erred by not stating findings of fact in support of its conclusion that the Committee plan was not fair and equitable, and feasible. (Committee Brief 56-57; Central National Brief 40).
 
 
 49
 Section 621 of the now superceded Bankruptcy Act provides for confirmation of a plan by the court if, inter alia, the plan was found to be "fair and equitable, and feasible." 11 U.S.C. § 621(2). In Case v. Los Angeles Lumber Co., 308 U.S. 106, 115-17, 60 S.Ct. 1, 7-8, 84 L.Ed. 110 the Court explained that the words "fair and equitable" are words of art and have a special meaning when used in reorganization cases. Hence, to be fair and equitable the plan must recognize that "the stockholder's interest in the property is subordinate to the rights of creditors; First of secured, and then of unsecured creditors." Id. at 116, 60 S.Ct. at 7 (quoting from Louisville Trust Co. v. Louisville, N.A. & C. Ry. Co., 174 U.S. 674, 19 S.C. 827, 43 L.Ed. 1130). Hence any determination that a plan is fair and equitable requires a valuation of the debtor's property. 6A Collier on Bankruptcy P 11.05, p. 184. Such a determination enables the court to decide whether any classes of creditors or stockholders must be excluded from the plan and to decide on an appropriate allocation of the new securities among those classes allowed to participate in the plan. Id.
 
 
 50
 Under certain circumstances stockholders may participate in a plan of reorganization of an insolvent debtor, but only if they make a fresh contribution of money or money's worth. Case v. Los Angeles Lumber Co., supra 308 U.S. at 122, 60 S.Ct. at 10. Whether or not the confirmed plan satisfied these requirements was a fact question and the trial court's finding thereon will not be disturbed unless clearly erroneous. In re Spectrum Arena, Inc., 462 F.2d 156, 158 (3d Cir.); see Gonzalez Hernandez v. de Aragon, 358 F.2d 930, 931 (1st Cir.). As we point out in Citibank, "(u)nless the court abused its discretion, we must affirm." Citibank, N.A. v. King Resources Co., supra at 1339. And as long as the approved plan is fair and equitable, we cannot reject it simply because "we might have appraised the facts somewhat differently." Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad, 318 U.S. 523, 564, 63 S.Ct. 727, 749, 87 L.Ed. 959; Citibank, N.A. v. King Resources Co., supra.
 
 
 51
 Inasmuch as we have already determined that the court's findings of valuation and insolvency were not clearly erroneous, and since we feel that the court properly followed the rules on priority, we affirm its determination that the plan is fair and equitable. See Citibank, N.A. v. King Resources, supra.[15] And because the Committee's proposed plan would allow participation by KRC stockholders, the court properly found such plan not to be fair and equitable.
 
 
 52
 The requirement that the plan be "feasible" simply insures that the plan is a practical one which will enable the company to "continue as a going concern and pay interest on its fixed charges and offer a reasonable prospect of dividends to its stockholders." Remington, a Treatise of the Bankruptcy Law of The United States, Vol. 11, § 4583 (1961); see In re Public Leasing Corp., 488 F.2d 1369 (10th Cir.). In other words, "(f)easibility means that the reorganized company will emerge from the proceeding in a solvent condition with reasonable prospects of financial stability and success." In re Imperial '400' National Inc., 374 F.Supp. 949, 959 (D.N.J.) (citing 6A Collier on Bankruptcy § 11.07); see In re Spectrum Arena, Inc., 340 F.Supp. 767, 780, aff'd 462 F.2d 156 (3d Cir.); Dietrich Corp. v. King Resources Co., 583 F.2d 1143, 1149 (10th Cir.). We sustain the district court's determination that the plan confirmed is feasible, especially in light of the fact that the reorganized company is debt free. (II App. 577, I App. 32). We need not discuss in detail appellants' claim that the Committee plan is also feasible since the plan is already unacceptable because it is not fair and equitable.[16]
 
 
 53
 Thus, for the reasons explained in our Citibank opinion and herein, we must reject the challenges to the district court's finding that the plan is fair and equitable, and feasible, and that finding is sustained.
 
 IV. THE REMAINING CONTENTIONS
 
 54
 Appellant Consolidated raises one issue relating to a separate appeal brought by it with regard to a contract between Consolidated and KRC. Consolidated requests some form of protective order by this court so that, in the event its separate appeal is successful, a means will be available for satisfaction of its claim. Inasmuch as Consolidated's appeal in Consolidated Oil & Gas, Inc. v. King Resources Co., No. 78-1870 (10th Cir., unpublished opinion filed Jan. 31, 1980), was decided adversely to Consolidated, we need not discuss what would now be merely an academic question.
 
 
 55
 Appellant Davis also raises a separate issue, arguing that the district court failed to comply with 11 U.S.C. § 575 in that information required to be sent to those creditors and stockholders affected by the plan was not sent to Dietrich class members but only to the attorneys representing the class. These representatives in turn notified class members that the representatives would vote on behalf of the class to accept the plan unless notified by class members of a desire to vote against the plan. Davis submits that the lack of information sent to class members was especially prejudicial because class members were relying on earlier information indicating KRC was clearly insolvent, even though later information indicated a possibility of solvency. (Davis Brief 10-14).
 
 
 56
 Davis also questions the validity of allowing the representatives of the Dietrich class to vote on behalf of all class members, arguing that 11 U.S.C. § 579 which allows acceptance of the plan "by or on behalf of creditors . . ." (emphasis added) refers only to agents or proxies as those terms are ordinarily used and not to representatives of a class as in the instant case. Further Davis says that the trustee failed to comply with Bankruptcy Rule 10-303(c) which requires that a ballot shall be mailed to everyone entitled to vote on the plan. Failure to do so coupled with the trustee's statement in a letter to the Dietrich class that ballots were not mailed because of the court order that only class representatives would vote led class members to believe they had no right to voice their opinion on the plan. (Id., 14-15). Davis also argues that the district court should not have determined that only creditors could vote on the plan before the determination of insolvency and that such a premature determination adversely affected the stockholders' rights. (Id.) Due to these irregularities, the reorganization statutes were not followed and thus the court's confirmation order was void. (Id. 16-18).
 
 
 57
 Davis' contentions appear to be directed more to the provisions of the order of Judge Finesilver entered in the Dietrich class action suit rather than the actions of the court in this case. But even if these issues are properly before us, we reject them. As we stated above, stockholders may not participate in the reorganization of an insolvent company without a fresh contribution of money or money's worth. Hence they are not "affected" by the plan and Davis was not entitled to vote as a stockholder.[17] See 11 U.S.C. § 579 ("(I)f the debtor has not been found to be insolvent," stockholders may vote on the plan.). Furthermore, we feel that the procedures required by the statutes were properly followed. We do not read 11 U.S.C. § 579 as narrowly as Davis to exclude class representatives from voting on behalf of class members. We believe that anyone filing written acceptances on behalf of creditors must be authorized to do so, In re Kenilworth Bldg. Corporation, 105 F.2d 673, 675 (7th Cir.), and a court order of authorization, as was made in this case, is sufficient. We find no error in the procedures followed by the district court.
 
 
 58
 Accordingly, for the reasons given in our opinion in Citibank and in this opinion we are convinced that the trial court's findings are amply supported by the record, that none of the challenges to the findings and conclusions should be sustained, and that the order confirming the plan should be and is
 
 
 59
 AFFIRMED.
 
 
 
 [1]
 The petition was originally filed in the Northern District of Texas and subsequently transferred to the District of Colorado on October 18, 1971. (XXXV R. 1572, 1586)
 
 
 [2]
 Texas International's motion to dismiss was denied without prejudice to renewal, on June 29, 1978, by an order of another panel and all parties were directed at that time to address issues raised by that motion in their briefs on appeal
 
 
 [3]
 In discussing the issue of mootness, none of the parties contends that this is a case capable of repetition yet evading review. Consequently we confine our discussion to the problem of whether or not relief could be afforded the appellants in the event of a decision in their favor or legal consequences could flow from a reversal of the order of confirmation
 
 
 [4]
 In light of the disposition of this case, we do not hypothesize what remedies would be appropriate in the event of a reversal, nor do we address the various remedies suggested by the parties
 
 
 [5]
 Consolidated Oil & Gas, Inc. is the only appellant which does not contest valuation. See discussion, infra, regarding Consolidated's claim
 
 
 [6]
 Although the district court expressed doubt about the use of cash flow figures in valuation, we note that the SEC apparently sanctioned its use in its Second Advisory Report to the court. See XXXIV Vol. 1218, see also Blum and Katz, Depreciation and Enterprise Valuation, 32 U.Chi.L.Rev. 236, 238-242 (1965)
 
 
 [7]
 In arriving at a 14.5% discount rate, the court noted that it was taking into account the present prime rate, the history of the company, risk and depletion. (II App. 574). Such factors are appropriate ones. See Kimball Laundry Co. v. United States, 338 U.S. 1, 17, n.8, 69 S.Ct. 1434, 1443, 93 L.Ed. 1765. See also Blum, Some Marginal Notes on TMT Ferry Reorganization: The New Math?, 1968 Supreme Court Review 77, 85 ("(T)he discount or capitalization rate applied to levels of earnings not previously attained ought fully to reflect the risks entailed in those estimates."). Support for this rate came from one of the Committee's own witnesses, Mr. Einhorn, who testified that the investment rate for business in general should be 1.5% to 2% over the prime rate, which at that time was 7.5%. Mr. Einhorn testified that this rate was for business in general rather than the petroleum industry specifically and that such rate made no provision for risk. (II App. 321-22; VI R. 640-41). The court arrived at its 14.5% rate by beginning with a 9.5% investment rate and adding 5% for risk and depletion
 Moreover, we do not feel that the court gave excessive consideration to the effect of depletion by capitalizing over a 20 year period rather than perpetuity and by including a depletion factor in the discount rate. In discussing its choice of a 20 year period the court noted:
 I completely reject the concept of capitalization in perpetuity. That is not accepted in my appraisal text with which I am familiar, and it surely cannot be accepted where you have an asset which is being consumed.
 Accepted appraisal practice, as I understand it, is that you should be very reluctant to predict for more than 20 years. Many people, many appraisers, feel 15 years is the outer limit. But in an effort to reach solvency, I am going to use 20 years. (II App. 573).
 We feel that these comments indicate that the court was using a 20 year period not simply because of the nature of the business but because it felt that accepted appraisal practice would limit capitalization of any company to this time period.
 
 
 [8]
 Appellant Dickerson quotes J. Bonbright, The Valuation of Property, 239 (1937) in arguing that assets which may be sold without impairing the company's going concern should be valued separately and their value added to the going concern value to determine what the entire property of the company is worth. (Dickerson Brief, 36)
 We note, however, that in the same paragraph as quoted by Dickerson, the author warns that "care must be taken not to include current assets which cannot be disposed of without impairing the earning capacity of the continuing business. Otherwise the appraiser would be guilty of double counting and capitalizing an earning power which is dependent, in part, on the retention of the very assets whose disposition he assumes." (Id.) Such a possibility lends support to the court's refusal to include a separate value for these properties.
 
 
 [9]
 In rejecting the Lewis Engineering Company report, the court stated:
 I can make absolutely no sense out of the James A. Lewis report. Even if you adjust it for the admitted $16 million error, you still come up with $30 million. I don't make any sense out of it at all and I totally and unequivocally reject it and I give to myself the luxury I give to juries: Day in and day out I give the stock instruction to juries. If you think that the opinion of an expert witness is not adequately supported either because of lack of education, training or experience or because of the reasons given in support of the opinion or if you think that such opinion is outweighed by other evidence, you may disregard the opinion. I disregard the opinion of James A. Lewis. (II App. 566).
 
 
 [10]
 In comparing Sun Oil Company to KRC, the court stated:
 I think beyond any shadow of doubt the most comparable company is Sun. That has to be true because it is the company with which King has interests in common, and it is the only company with which King has interests in common in the Canadian Arctic.
 It is a company which has explored extensively in the Canadian Arctic, and it is a company active in the market. (II App. 574-75).
 
 
 [11]
 Counsel for the King children, in objecting to the court's judicial notice of price/earning ratios, requested that the court confine itself to "comparable companies" which were in evidence. The court replied that it would probably confine itself to one company which was "all over the record in this case." (II App. 476-77). Appellants maintain that regardless of the numerous times Sun Oil Company was mentioned, there was no evidence as to it being a comparable company to KRC. Because the court did not specifically state which company it considered as comparable until it made oral findings, it would appear from the language of Rule 201 that the parties could at that time have requested a hearing on the propriety of that judicial notice. There is no indication from the record that such a request was made
 
 
 [12]
 In arriving at its valuation, the court averaged projected income for the years 1978, 1979, 1980 and 1981. Using this average of $12,619,250 as an annual income stream, projecting this income over a 20 year period and using a discount rate of 14.5%, the court arrived at a present value of $81,227,603. To this figure was added the $18,230,600 value of the Canadian Arctic properties for a total of $99,458,203
 The court also made two other determinations of value, first looking at the price earnings ratio of Sun Oil Company and determining a present value factor of 16.6% which, when applied to the other figures, yielded a total value, including the Canadian Arctic interests, of $90,726,839. The final determination was made by using a price earnings ratio of seven from "comparable energy companies" selected from the Wall Street Journal. Using a 14.3% (see n.7, supra ), present value factor from this figure the total value was $100,384,921.
 The court then determined that the value of the company was between $90 million and $100 million and "to satisfy the people who want precision on the value," the court fixed an exact value by averaging the above three figures to yield a value of $96,856,850. In making the determination of the "exact value" the court noted that it was "absurd" to expect that a value could be made with such precision. (II App. 573-77).
 It is true that the court used the Sun Oil and other energy company figures to arrive at the "exact value" of $96,856,850, and discussed those figures in analyzing the evidence on value. However the court had before it other clearly competent evidence to support its determination first that the value of the company was "somewhere between $90 million and $100 million as a going concern," which was followed by the fixing of the "exact value" of $96,856,850. (II App. 577).
 
 
 [13]
 With respect to this transaction the court discussed the fact that Texas International bought up the claims of several banks against KRC for $1.02 per each dollar of debt without regard to post-petition interest. The court stated, inter alia:
 The most interesting approach, and the one I give the most weight to, is the Texas International comparison. I don't think it helps any to arrive at an exact figure, but I do think it is a very persuasive comparison in arriving at a decision of solvency or insolvency.
 My experience with bankers is such that I do not think that the banker has ever been born who gave away a dollar he thought he could collect, and that is why I say (I can think) of no better indication of what some of the finest minds in the financial world think as to solvency or insolvency of this case. (II App. 569, 571).
 
 
 [14]
 In the table of contents to his brief, appellant Davis lists among his arguments the assertion that the court erred in finding that the plan submitted by him was not fair and equitable, and feasible. However, this argument is not developed in the body of his brief. We will assume he relies on the arguments on this general issue as developed by Central National and the Committee
 
 
 [15]
 The Indenture Trustees note in their brief that the conversion feature renders the confirmed plan unfair and inequitable to the debenture holders. This argument is fully addressed and rejected in our opinion in Citibank
 
 
 [16]
 Nor do we find it necessary to discuss in detail the claim that the court erred by not stating its reasons for finding the Committee plan not to be fair and equitable, and feasible, since it is well-settled that without a fresh contribution of money or money's worth, stockholders may not participate in the reorganization plan of an insolvent debtor. Case v. Los Angeles Lumber Co., supra
 
 
 [17]
 Nor was there any prejudice to stockholders by the court's comments concerning voting prior to the determination of insolvency at the confirmation hearing. Davis is apparently confusing the finding of insolvency which is required before the plan is submitted for a vote with the finding of insolvency at the confirmation hearing. See 11 U.S.C. § 574